[No. 20153.  In Bank. — March 16, 1886.]

## IN THE MATTER OF THE APPLICATION OF J. D. GUERRERO, ON HABEAS CORPUS.

MUNICIPAL CORPORATION — POWER TO IMPOSE LICENSES — CONSTITUTIONAL LAW. — Under sections 11 and 1 of article 11 of the constitution of 1879, a municipal corporation has power to impose licenses for carrying on business, or for revenue, or both.

ID. — EFFECT OF CONSTITUTION ON EXISTING MUNICIPALITIES. — The constitution did not abolish the municipalities of the state, nor abrogate their charters, nor change the powers granted by them, except where they may have been enlarged or contracted by its provisions; on the contrary, the constitution made existing municipalities more independent of state control, by inhibiting the legislature from passing special laws for any municipality, and from imposing taxes for any municipal purpose. At the same time it conferred upon all existing municipalities the power to make and administer, within their respective limits, all such local, police, sanitary, and other laws as are not in conflict with the general laws of the state.

ID. — CITY OF LOS ANGELES — ORDINANCE OF SEPTEMBER 29, 1885 — VALIDITY OF. — At the time of the passage by the city of Los Angeles of the ordinance of September 29, 1885, providing for the licensing of business carried on within the city, there had been no general laws passed by the legislature, which, in terms or by implication, conflicted with the provisions of the ordinance, or restricted the municipality in the exercise of its power to pass it. The ordinance was therefore in harmony with the constitution, the general laws of the state, and the city charter.

ID. — AUTHENTICATION OF ORDINANCE BY CLERK. — Section 2 of article 12 of the charter provided that every ordinance passed by the council should, before it became effective, be signed by the clerk of the council. The charter further provided for the election of a city auditor, who should also be ex officio clerk of the council. The ordinance in question was signed by "W. W. Robinson, clerk of the council of the city of Los Angeles." Held, that the ordinance was properly authenticated under section 1031 of the Political Code.

ID. — ORDER FOR PUBLICATION OF ORDINANCE. — The ordinance provided that the clerk of the council should certify to its passage, and cause it to

be published in a designated newspaper. *Held*, that the order for publication was sufficient, and the fact that it was contained in the ordinance did not affect either the order or ordinance.

ID. — *Held further*, that to render the order effectual its publication was not necessary.

ID. — LIQUOR LICENSE — REASONABLENESS OF. — The ordinance required that a license fee of fifty dollars a month should be paid by a person carrying on the business of a saloon, where liquors are sold or given away in quantities less than a gallon. *Held*, that it could not be presumed as a matter of law that the amount of the license was oppressive, unreasonable, or prohibitory of trade.

ID. — VIOLATION OF ORDINANCE — PUNISHMENT BY MUNICIPALITY. — The city of Los Angeles had power under its charter to provide that any violation of the provisions of the ordinance should be a misdemeanor and punishable as such. The power is also conferred upon the municipality by the provision of the constitution authorizing it to make and enforce within its limits all such local, sanitary, and other laws as are not in conflict with the general laws of the state.

ID. — ISSUANCE OF LICENSE — DELEGATION OF AUTHORITY — PERMIT FROM POLICE COMMISSIONERS. — The city council has authority to delegate the performance of the ministerial act of issuing licenses to the clerk of the council, and also to make the issuance of a license for the sale of liquors conditioned upon the applicant's obtaining a permit from the board of police commissioners.

ID. — CITY COURT OF LOS ANGELES — CONSTITUTION DID NOT ABOLISH. — The city court of Los Angeles, as created by the charter of the city, was not abolished by the constitution, nor are the provisions of the charter making the mayor of the city a component part of the council and *ex officio* city judge unconstitutional.

ID. — MAYOR AS JUDGE — DISQUALIFICATION. — The fact that the mayor presided over the council that passed the ordinance did not divest him of his authority under the charter to act as the judge of the City Court on the trial of a prosecution for violating the ordinance; nor was he as judge of that court disqualified from trying such a case because the charter required all fines collected therein to be paid into the salary fund, or because his action as mayor in approving the ordinance had been severely criticised by the city press.

APPLICATION for a writ of *habeas corpus*. The facts are stated in the opinion of the court.

*Howard & Robarts*, and *Bicknell & White*, for Petitioner.

*J. W. McKinley*, *W. T. Williams*, and *F. P. Kelly*, for Respondent.

McKEE, J. — The petitioner complains that he is imprisoned under a judgment given against him by the

City Court of Los Angeles, for having violated an ordinance of the city by "carrying on, within the corporate limits of the city, in his own name, and for his own profit and benefit, the business of a place where spirituous and vinous, malt and mixed, liquors were sold in quantities less than one gallon, without first procuring a license so to do"; and he asks to be discharged from imprisonment, on the ground that the ordinance is void and the judgment of conviction invalid.

The ordinance is entitled "An ordinance to provide for the licensing of business carried on in the city of Los Angeles," approved September 29, 1885; and the contention is that it is void, because the municipal legislative body of the city had no power to pass it, and because it was not authenticated and ordered published, as required by the city charter.

The charter was granted in the year 1878. Under it the city was administering its local affairs, as an existing municipality of the state, at the time of the adoption of the present constitution; sections 11 and 12 of article 11 of which provide:—

"Sec. 11. Any county, city, town, or township may make and enforce, within its limits, all such local, police, sanitary, and other regulations as are not in conflict with general laws.

"Sec. 12. The legislature shall have no power to impose taxes upon counties, cities, towns, or other public or municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

And section 5 of article 1 of the charter of the city granted power to "the mayor and council of the city . . . . to license the carrying on and conducting of any and all professions, trades, callings, and occupations, or other business, by any person, natural or artificial, within

the corporate limits of said city; to fix the amount of license tax thereon, and to .be paid by such persons therefor, at such sums, respectively, as the said council shall think equitable and just, and may, in the name and for the benefit of said corporation, enforce, in such manner as it sees proper to prescribe, the payment of such license taxes, by suit, either with or without attachment, in the proper court, under the laws of this state, or by fine and imprisonment, or either, or in such other manner as in said ordinance may be provided." (Stats. 1877–8, p. 655.)

The power of the city to pass the ordinance under consideration is therefore derived from the charter of the city and the constitution of the state.

Of the power of the state to authorize the license of all classes of trades and employments there is no doubt; and there is just as little doubt that the legislature, at the time it granted to the city of Los Angeles its charter of incorporation, had authority to delegate to the city the power of the state for that purpose. But a legislative grant of power to a municipal corporation, to license business, etc., within its corporative limits, does not necessarily include a power to impose licenses for revenue purposes. The distinction between the two powers is well recognized. Imposing licenses for regulating business, etc., is an exercise of the police power, while imposing them for revenue purposes is an exercise of the taxing power. (2 Dillon's Mun. Corp., sec. 768.) It may, therefore, be questionable whether, before the constitution of 1879, the city had, under its charter, power to impose licenses for purposes of revenue; but under the provisions of the constitution which we have quoted, there is no doubt of the power of municipalities to impose licenses for the purpose of regulation, or revenue, or for both regulation and revenue; and for those purposes the power of the municipality of Los Angeles has been sustained in *City of Los Angeles* v. *S. P. R. R. Co.*, 61 Cal. 60.

The present constitution did not abolish the municipalities of the state, nor abrogate their charters, nor change the powers granted by them, except where they may have been enlarged or contracted by its provisions; on the contrary, the constitution made existing municipalities more independent of state control, by inhibiting the state legislature from passing special laws for any municipality and from imposing taxes "for any municipal purpose." At the same time it conferred upon all existing municipalities power to make and administer, within their respective limits, all such local, police, sanitary, and other laws as as are not in conflict with general laws. (Art. 11, sec. 11.)

There was no general law passed by the legislature, which, in its terms or by implication, at the time of the passage of the ordinance in question, conflicted with the provisions of the ordinance or restricted the municipality of Los Angeles in the exercise of its power to pass the ordinance. (*Ex parte Ah Toy*, 57 Cal. 92.) The ordinance was therefore in harmony with the constitution of the state, the general laws of the state, and the city charter.

But it is contended that the ordinance did not become a law of the municipality, because, as passed by the "mayor and council," it was not authenticated in the form prescribed by the charter, and was not ordered to be published as the charter required.

There is appended to the ordinance a certificate in the following words:—

"I hereby certify that the foregoing ordinance was adopted by the council of the city of Los Angeles at its meeting of September 22, 1885.

"W. W. Robinson,
"Clerk of the Council of the City of Los Angeles."

This certificate appears to have been made under section 2, article 12, of the charter, which provides:—

"Every ordinance and resolution which shall have

been passed by the council shall, before it becomes effective, be signed by the clerk of the council, and be presented to the mayor for his approval and signature."

It is said there was no such officer as "clerk of the council" elected or appointed by the city. But the charter authorized the election of a city auditor, who, it was provided, "shall also be *ex officio* clerk of the council." There were therefore two offices whose functions were to be performed by one and the same person. In the performance of his official functions, where it became necessary for him to authenticate an official act, done in either office, the law of his position did not require the officer to designate himself as " auditor and *ex officio* clerk of the council." On the contrary, the code law provides: "When an officer discharges *ex officio* the duties of another office than that to which he is elected or appointed, his official signature and attestation must be in the name of the office the duties of which he discharges. (Sec. 1031, Pol. Code.) The signature to the certification of the ordinance was therefore according to law. (*Touchard* v. *Crow*, 20 Cal. 150.) And there was an order made, according to law, for the publication of the ordinance. The ordinance itself contained an order for its publication, worded as follows:—

"Sec. 5. The clerk of the council shall certify to the passage of this ordinance, and shall cause the same to be published once in the Los Angeles Daily Herald, and it shall take effect and be in force from and after November 1, 1885." We think that was sufficient. The fact that the order was made and included in the ordinance does not affect the validity of the order or ordinance. To render the order effectual, its publication was not necessary; and no contention is made that the ordinance was not published under the order. It follows that the ordinance was certified and ordered published, as prescribed by the charter.

Another objection is, that conceding the ordinance was passed according to prescribed forms, it is unreason-

able and in restraint of the business for the regulation of which it purports to have been passed.

The amount of the license is fifty dollars per month, or six hundred dollars per annum. That amount was fixed by a section of the ordinance in the following words:—

"Sec. 2. That the monthly rates of license for the pursuits, business, trades, occupations, avocations, and employments hereinafter named be, and the same are hereby, established for and within the city of Los Angeles, and the same shall be paid by the owners or proprietors thereof, as follows,—that is to say: . . . .

" For every saloon, bar, store, or place, including club-rooms where spirituous, vinous, malt, or mixed liquors are sold or given away in quantities less than one gallon, fifty dollars per month.

" *Provided, further,* that no license to keep a saloon, bar, or other place for the sale of spirituous, vinous, malt, or mixed liquors shall be issued to any person until a permit in writing from the board of police commissioners, authorizing such issue, shall have been filed with the clerk of the council, and the board of police commissioners shall have power to issue such permit and revoke the same at any time," etc.

It is insisted courts are bound to take judicial notice that such an imposition is *per se* a virtual embargo against the sale of liquors less than a gallon, and for that reason *ultra vires.*

But the power to impose licenses at all for municipal purposes being granted, it was coupled with the power to consider and determine the nature of the occupations, trades, and business to be licensed, in the exercise of which the legislative body could discriminate between business which may be useful and beneficial to the community and that which may be immoral or disorderly in its nature and tendency, and fix the licenses at such sums as to it "shall seem equitable and just."

The power to fix the amount of licenses for all classes of business was therefore left to the discretion of the municipal legislature; the exercise of such discretion over subjects within the jurisdiction of the corporation cannot be controlled by the courts. Courts are bound to presume the legislature deals with such matters for the public good; and the municipal law, which expresses the will of the municipality upon those matters, will be presumed to be reasonable, unless the contrary appears on the face of the law itself. " It is not to be expected," say the Supreme Court of Missouri, " that every power will always be exercised with the highest discretion, and when it is plainly granted, a clear case should be made to authorize an interference upon the ground of unreasonableness." (*City of St. Louis* v. *Weber*, 44 Mo. 550.)

Applying these principles to the ordinance under consideration, we cannot judicially say, as matter of law or fact, that the amount of the license complained of in this proceeding is oppressive, unreasonable, or prohibitory of trade. (*Ex parte Benninger*, 64 Cal. 213.)

In *Ex parte Hurl*, 49 Cal. 558, it was said: " It certainly cannot be assumed that the exaction of fifty dollars for the privilege of retailing spirituous liquors, . . . . for the period of ninety days, will *per se* put an end to that business"; and in *Ex parte Wolters*, 65 Cal. 269, the license exacted for carrying on a like business in Butte County was fifty dollars per month, as in this case, and it was sustained by this court. (See *People* v. *Dwyer*, 4 West Coast Rep. 438.)

Another attack upon the ordinance is that it declares that any violation of its provisions "shall be deemed a misdemeanor and punishable as such." This, it is urged, was in excess of the power of the municipal legislative body, because the state legislature itself could not delegate to a municipal corporation power to determine what shall constitute a criminal offense.

But the charter contains the following provisions:—

"The mayor and council, or either, when authorized by this act to adopt any ordinance or resolution, or make any rules or regulations, such municipal authority so empowered shall have the further power, and is hereby authorized, to provide that each and every violation of such ordinance, resolution, rules, or regulation shall be and constitute a misdemeanor," etc.

In *State* v. *Tryon*, 39 Conn. 183, a like contention was urged against an ordinance passed under a charter which provided "that the violation of any ordinance relative to nuisances injurious to health, illegal voting, obstructions to streets, illegal charges of hackmen, weights and measures, or any order or ordinance designed to prevent vice, immorality, or disorder, etc., *shall be a misdemeanor,* and may be prosecuted as such before the Police Court of the city, like other offenses"; but the Supreme Court of Connecticut held that the contention was not maintainable. Says the court: "All the authority that the city council have in the premises is simply to determine whether they will pass ordinances on those subjects or not. If they pass such ordinances, it is the charter, passed by the legislature in the form of a law, and which has all the authority of a statute law, that declares that a violation of such ordinances shall be a misdemeanor. . . . . The legislature have declared that the maximum penalty is none too great for a violation of the ordinance, if one should be made."

Besides, as we have seen, the constitution of the state empowered the municipality to make and enforce, within its limits, all such local, sanitary, and other laws as are not in conflict with general laws. The power thus delegated by the constitution itself, for local purposes, included a power to prescribe punishment for disobedience of laws by fine, penalty, or imprisonment. Denominating the act of disobedience a misdemeanor and making it punishable as such is within the power granted, and does not affect the validity of the ordinance.

Again, section 4 of the ordinance provides :—

"It shall be the duty of the clerk of the council to issue a license under this ordinance to each person so reported to him, and for all other persons known to the clerk, liable to pay a license under this ordinance, duly signed by the mayor of said city and clerk of the council, and to fix and state the amount of license thereon, and on the first Monday of each month deliver such license to the said city tax collector for collection, taking his receipt for the amount thereof, and the said clerk in fixing the rate of license for the several classes in this ordinance, hereinbefore specified, shall grade the same according to his best information and knowledge, and for that purpose may confer with the persons in interest, and may require any person to file his or her affidavit as to which class he or she may belong; provided, that in no case shall any mistake by the clerk in fixing the amount of said license prevent the collection of what shall be actually due, with all costs against any one selling or carrying on said business without license or refusing to pay such rate so fixed by the clerk. It shall be the further duty of said clerk, immediately after the delinquent list has been delivered to him, to deliver the licenses uncollected to the chief of police, whose duty it shall be to at once proceed to collect the same, in his discretion, by suit or otherwise."

It is said that the duties which this section of the ordinance directs the clerk to perform were incumbent upon the council to whom power to perform was delegated; and being delegated to the council, that body could not delegate its powers to its clerk or any other officer.

The provisions, however, were only regulative of the mode of issuing and collecting the licenses imposed by the ordinance; the acts required of the clerk and tax collector were therefore ministerial; and while it is undoubtedly true that public powers and trusts devolved.

by law or charter upon the. governing body of a munici-
pality, to be exercised by it in such a manner as it shall
judge best, cannot be delegated to another (*Birdsall* v.
*Clark*, 73 N. Y. 73), yet the power to do acts which do
not involve judgment or discretion, but are merely
mechanical or ministerial, may be delegated. "The
true distinction," observes the Supreme Court of Ohio,
"is between the delegation of power to make the law,
which necessarily involves discretion as to what it shall
be, and conferring an authority or discretion as to its
execution, to be exercised under and in pursuance of the
law. The first cannot be done; to the latter no valid
objection can be made." (*C. W. & Z. R. Co.* v. *Com-
missioners of Clinton County*, 1 Ohio St. 88.)

The following proviso in the ordinance is also chal-
lenged: " No license to keep a saloon or bar, or other
place for the sale of spirituous, vinous, malt, or mixed
`liquors shall be issued to any person until a permit in
writing from the board of police commissioners, author-
izing such issue, shall have been filed with the clerk of
the council, and the board of police commissioners shall
have power to issue such permit and revoke the same at
any time, and after the filing of such revocation with
the clerk of the council the said clerk shall issue no
further license to the party whose permit is revoked
until a new permit be granted said party."

This condition, imposed upon persons entitled to
licenses, affects only the operation of the ordinance, and
not .its·existence. It is the mode prescribed for issuing
licenses to persons who want to engage or wish to con-
tinue .in a licensed occupation. As mere mode the
condition imposed is not more unusual or onerous than
statutory law or local ordinance, passed in the exercise
of the police power of the state, has frequently prescribed
for other occupations or professions. Says the Supreme
Court, in *Ex parte Yale*, 24 Cal. 242: "The manner, terms,
and .conditions of .an .attorney's admission to practice,

and of his continuing in practice, as well as his powers, duties, and privileges, are subject to legislative control the same as any other profession or business that is created or regulated by statute"; therefore the statute which required, as a condition to admission to practice or to continue in practice, the taking of the oath prescribed was constitutional.   So in *Ex parte Frazer*, 54 Cal. 94, and *Ex parte Johnson*, 62 Cal. 263, we held that a statute passed to regulate the practice of medicine, which made it a misdemeanor for a physician to practice medicine without having first procured a certificate from a board of examiners appointed by certain medical societies, was not subject to constitutional objection.

Lastly, it is contended that the judgment of conviction is void, because,—1. The city court of Los Angeles was abolished by section 1, article 6, and section 1, article 22, of the present constitution; and 2. If not abolished, the court had no jurisdiction to try the petitioner for the offense with which he was charged.

The constitution of 1879 abolished all courts except "Justices' and Police Courts,"—these it continued in existence.   (Const., sec. 3, art. 22.)   At the same time it vested the judicial power of the state in certain designated courts, and authorized the legislature to establish inferior courts in any incorporated city or town, or city and county, and fix by law their jurisdiction; and the powers, duties, and responsibilities of the judges thereof. (Const., secs. 1 and 13, art. 21.)

But the judicial departments of the municipalities of the state, as created by their respective charters, were not affected by these provisions.   The constitution left all municipal bodies free to administer their local affairs under their forms of municipal government, with the powers conferred upon them by their charters, and such additional powers as were thought adequate to the purposes of their creation.   This was the *status* of the municipal corporations of the state at the time of the

adoption of the present constitution. As such they have since continued to exist, before and after the first day of July, 1880,—the day fixed by section 1, article 22, of the constitution, for the cessation of all laws inconsistent with its provisions,—working under charters unchanged, except in such changes as may have been made by the constitution; and the existence of each municipality under its charter is continued by the constitution until a majority of the electors of the municipal body determine to reincorporate under general law, or to frame a charter for its government. (*Desmond* v. *Dunn*, 55 Cal. 242; *Wood* v. *Board of Election Commissioners*, 58 Cal. 561.)

We are not aware that the city of Los Angeles has reorganized or reincorporated under any general law, or that its charter has been changed since the constitution went into effect pursuant to its provisions. The judicial power of the city is therefore vested in the court to be held by the judicial officer provided by the charter; and as such he could exercise such judicial powers as may be contained in the charter, and try and determine all local causes, within the charter jurisdiction, conferred upon him. (*People* v. *Henry*, 62 Cal. 557; *Ex parte Carrillo*, 66 Cal. 3.) The fact that the same person officiated as mayor, and as mayor presided in the local legislative body which passed the ordinance, did not divest him of his authority under the charter to act as the judicial officer of the court. The provisions of the charter which made the mayor of the city a component part of the council and "*ex officio* city judge" are not in conflict with the constitution. As was said in *Uridias* v. *Morrill*, 22 Cal. 474, "there is nothing in the constitution which prohibits the legislature from declaring the mayor of a city to be *ex officio* a justice of the peace; and under such a law the same person may constitutionally exercise the functions both of mayor and justice." (See also *People* v. *Provines*, 34 Cal. 520.) A mayor's court, or a city court, as a mere municipal court, is regarded as a justice's court.

The city court had jurisdiction of the action and the person of the defendant. Having jurisdiction of the action and the party defendant, the judge of the court had power to proceed to the final disposition of the same, unless from interest or some other reason he was disqualified from acting. His qualification to act was challenged by an affidavit, made and filed by defendant, which contained a statement of defendant's belief that he could not have a fair and impartial trial in the city court on account of the prejudice and bias of the judge, who, as judge of the court and mayor of the city, was the subject of much acrimonious discussion by the newspapers and persons within the municipality, in connection with the passage of the ordinance, and in consequence thereof "the said mayor and judge is interested in the result of the trial, and is interested in convicting affiant." It is also urged that as section 12, article 5, of the charter provides that "all fines collected in said city court shall be paid by the said judge into the city treasury, and be placed to the credit of the salary fund," and as subdivision 1, section 2, article 11, of the charter provides that the mayor of the city shall receive a monthly salary of $150, the mayor, as *ex officio* city judge, was interested in convicting the petitioner of violating the ordinance. It is difficult to see how these provisions of the charter made the judge of the court personally or pecuniarily interested in a criminal action for violating an ordinance, so as to incapacitate him from trying it, and from enforcing conviction by the collection of a municipal fine or imprisonment. Nor does the fact, stated in the affidavit, "that the action of the mayor in approving the ordinance has been largely assailed in the city by individuals and by the press," disqualify the mayor as *ex officio* city judge from exercising his judicial functions in proceedings before him within his jurisdiction; nor was it sufficient as a basis for an application to change the place of trial in the proceedings; and there

was no excess of jurisdiction in denying the application made upon the affidavit for that purpose. (*People* v. *Williams*, 24 Cal. 31; *McCauley* v. *Weller*, 12 Cal. 500.).

Writ dismissed and petitioner remanded.

MYRICK, J., SHARPSTEIN, J., THORNTON, J., and MORRISON, C. J., concurred.

ROSS, J., dissenting.—I think the portion of the ordinance involved in this case is void, for the reason that the power conferred on the mayor and council by the charter of the city is in effect delegated by that body to the board of police commissioners.

By the charter of the city of Los Angeles the power "to license the carrying on and conducting of any and all professions, trades, callings, occupations, or other business, by any person, natural or artificial, within the corporate limits of said city, is vested in the *mayor and council.*

"The principle is a plain one," says Dillon in his work on Municipal Corporations, "that the public powers or trusts devolved by law or charter upon the council or governing body, to be exercised by it when and in such manner as it shall judge best, *cannot be delegated to others.* Thus, where by charter or statute local improvements, to be assessed upon the adjacent property owners, are to be constructed in 'such *manner* as the *common council* shall prescribe' by ordinance, it is not competent for the council to pass an ordinance delegating or leaving to any officer or committee of the corporation the power to determine the mode, manner, or plan of the improvement. Such an ordinance is void, since powers of this kind must be exercised in strict conformity with the charter or incorporating act. So where a power— for example, *the power to issue licenses*—is granted by law or by an ordinance duly passed to the mayor *and aldermen,* they are constituted to act as one deliberative body,

to the end that they may assist each other by their united wisdom and experience, and the result of their conference be the ground of their determination; and when this is the case, the board of aldermen cannot, even by a vote, delegate the power to the mayor alone." (Sec. 96, 1 Dillon on Mun. Corp.) And in section 357 of the same volume the learned author says: "Where, by the charter of a city, the power to license a particular occupation within its limits is given to the common council, such power involves the necessity of determining with reasonable certainty both the extent and duration of the license and the sum to be paid therefor; *and must be exercised by the common council, and cannot be delegated by it, in whole or in part, to any person or authority.*" (See also Cooley's Const. Lim. 204.)

Now, the ordinance here in question provides, among other things, "that no license to keep a saloon, bar, or other place for the sale of spirituous, vinous, malt, or mixed liquors shall be issued to any person until a permit in writing from the board of police commissioners, authorizing such issue, shall have been filed with the clerk of the council, and the board of police commissioners shall have power to issue such permit and revoke the same at any time; and after the filing of such revocation with the clerk of the council, the said clerk shall issue no further license to the party whose permit is revoked until a new permit be granted said party.

This language does not admit of construction. It is direct and simple, and clearly and unequivocally makes the granting of the licenses in question to depend upon the action of the board of police commissioners. Nor is there any limit to the power thus attempted to be conferred upon that board. No conditions whatever are imposed, but the broad and unconditional power attempted to be given to grant or withhold permits at will. As by the terms of the ordinance no license can be issued for conducting the business in question until a permit in

writing from the board of police commissioners, authorizing such issue, shall have been filed with the clerk of the council, it follows necessarily that the granting or withholding of such licenses is in effect vested by the ordinance in that board. No argument can make this· plainer. It is, it seems to me, a self-evident proposition.

In the case of the *City of East St. Louis* v. *Wehrning*, 50 Ill. 28, the charter conferred upon the city council power "to restrain, prohibit, and suppress tippling-houses, dram-shops, gaming, bawdy, and other disorderly houses." The ordinance declared that "licenses may be granted under this article to proper persons, for a period of not less than one month nor more than six months, to be determined by the city treasurer in each case, but the city treasurer may, in his discretion, reject any application for license under this article, for a longer period than one month, and, with the concurrence of the mayor, he may reject any application for license under this article."

The court said: "The provision of the charter manifestly intended that the power should be exercised by the city council, under reasonable and proper ordinances, and not that they should authorize an individual to grant or refuse a license, or to fix the amount which should be paid for a license. If the treasurer may, under this ordinance, refuse licenses with the concurrence of the mayor, then they, and not the city council, would regulate or suppress dram-shops; and if the treasurer may in his discretion fix the sum to be paid, then he, and not the city council, would discharge that duty.

"In the proper exercise of this power, the city council should adopt general ordinances, prescribing a general rule by which licenses might be obtained. They might, no doubt, prescribe the character of persons who might or might not obtain licenses; or they might, in their regular or called meetings, in such manner as they might ordain, grant such licenses. The ordinances

should prescribe the amount required to be paid for such license, either by an ordinance relating to the entire city, or grade the rates by divisions or portions of the city, or otherwise. The ordinance should be of that general character that all persons coming within its requirements should be entitled, by complying with its provisions, to receive a license, and the amount to be paid should be determined by ordinance or order of the council, and not left within the discretion of a single officer of the city."

These observations by the Supreme Court of Illinois are applicable to the case before us. Of course, if the business in question, or any other licensed business, be conducted in a manner that is offensive or dangerous to the public interests, the governing body of the city may direct the manner to be changed and prescribe regulations for its prosecution. But the right to regulate its prosecution is an altogether different thing from the right to delegate the power to license.

As in my opinion the portion of the ordinance involved in this case is void, for the reason above given, it is unnecessary for me to consider any other point.

It results from these views that the petitioner is illegally restrained and should be discharged.