THE PEOPLE EX REL. PATRICK STEWART v. THE YOUNG MEN'S FATHER MATTHEW TOTAL ABSTINENCE BENEVO- LENT SOCIETY No. 1 OF DETROIT.

*Constitutional law — Titles of statutes — Corporation laws to be strictly construed — By-laws — Qualification for membership:*

Corporation by-laws should apply to all members alike, and special exemptions from their operation cannot make them valid if they are not so otherwise.

The constitutional provision that "no law shall embrace more than one object which shall be expressed in its title" is violated if an act is amended so as to embrace a purpose outside of its title and inconsistent with provisions remaining unrepealed.

Act 356 of 1865 authorizes the formation of corporations exclusively for literary and scientific purposes. Act 18 of 1867 amends it

"to include missionary and other benevolent purposes," but does not change the title nor repeal the inconsistent provision limiting the objects of such corporations to the promotion of literary and scientific pursuits. *Held* that the law of 1867 is unconstitutional.

The laws of Michigan distinguish between religious purposes and those of general benevolence.

Whether an incorporation is binding if the principal part of the agreement under which it is framed cannot in law be sustained—*Q.*

Where the articles of a corporation prescribe the conditions of membership, no additional restriction can be imposed by the by-laws without amending the articles.

A corporation organized under Act 356 of 1865 cannot have any officers whose authority does not come directly from the choice of the stockholders or through the directors, and the statute does not authorize any delegation of power to any committee except to such as are directors.

An incorporation act can never be extended by construction to cases not reasonably within its terms.

It is a matter of policy and not of law to determine the powers and conditions of corporate existence, and it requires legislative judgment as to every distinct purpose meant to be provided for.

A corporation that had usurped certain franchises, but not in bad faith, was merely ousted therefrom, with a nominal fine and costs.

INFORMATION in the nature of *quo warranto*. Submitted April 24. Decided June 4.

*Griffin & Dickinson* for relator. All by-laws must be reasonable and not contrary to the laws of the State, Field on Corporations, 331; Green's Brice's Ultra Vires, 12, and their reasonableness is for the court to settle, *Com. v. Worcester*, 3 Pick., 461. See also *Rex v. Ginever*, 6 T. R., 732 and cases; *Rex v. Tunwell*, 3 Doug., 207; *Rex v. Tappenden*, 3 East, 186; *Queen v. Saddler's Co.*, 10 H. L. Cas., 404.

*Atkinson & Atkinson* for respondent.

CAMPBELL, C. J. The information in this case was filed by the attorney general for an alleged abuse of corporate franchises, in imposing, under certain amended rules and by-laws, conditions which subjected the inter-

ests of the society to the control in certain respects of a spiritual director appointed by the Roman Catholic bishop of Detroit, confined membership to Roman Catholics, and introduced some other analogous regulations.

The plea admits the amendments and claims that all the members were Roman Catholics but relator, and sets up certain reasons why they ought not to be considered unreasonable, and avers that relator by resolution has been exempted from the penalties of the by-laws.

It is plain, however, that all corporation by-laws must stand on their own validity, and not on any dispensation granted to members. They cannot be subjected to any conditions which do not apply to all alike, and cannot be compelled to receive as matter of grace anything which is matter of right; neither on the other hand should there be personal exemptions of a general nature from any valid regulations that bind the mass of corporators.

To understand the legal position of the controversy it is necessary to examine the statutes and the articles of agreement.

In 1865 a law was passed entitled "An act to authorize the formation of corporations for literary and scientific purposes." The third section in prescribing what should be set forth by each society in the articles, included—"*Third*. The objects for which it is organized, which shall be only for the promotion of literary and scientific pursuits." Sess. L. 1865, pp. 725–6. The second section in giving general directions for the agreement, contained a similar reference to its purposes.

In 1867 an act was passed to amend section 2 of the act of 1865 "so as to include missionary and other benevolent purposes." 1 Sess. L. 1867, p. 21. This amendment made that section read as follows: "Sec. 2. Any number of persons, not less than ten, who shall by articles of agreement in writing, associate themselves together according to the provisions of this act, for literary or scientific purposes, or both, *or for missionary or other*

*benevolent purposes*, and who shall comply with the provisions of this act, shall, with their successors and assigns, constitute a body politic and corporate, in fact and in name, under any name assumed by them in the articles of agreement: *Provided*, That no two societies shall assume the same name."

This association was organized under these statutes on the 12th of March, 1868, under articles containing in addition to the business clauses, some provisions indicating the purposes of the society, to which reference is necessary. Article 3 is as follows:

"The objects for which this corporation is organized are, to encourage total abstinence· from all intoxicating beverages, including cider, cordials, fermented and spirituous liquors of every kind, name and description, to provide ·relief in case of sickness or accident, and for the burial of deceased members, and to promote, foster and encourage literary pursuits of any kind among its members, including the cultivation of taste for music and scientific acquirements, and to which end a library shall be procured and maintained."

The 5th article declared that every person elected might be a member on paying the dues and taking the pledge therein recited of abstinence, if not under fifteen years of age, nor over forty-five, nor infected at the time of election with any disease likely to make such person a burden on the society.

By article 6 penalties and disabilities were provided for violating the pledge.

By article 7 it was provided as follows: "The members of said corporation shall on the seventeenth day of March in each and every year, join in a public procession, in full regalia, with music, under penalty to be provided in said by-laws," etc.

The statute contains no provision for amendment of the original articles, and no changes in them have ever been made. In April, 1878, the by-laws were altered in the following particulars: The by-law declaring when

the ordinary officers should be chosen, was amended by adding the following clause: "There shall be a spiritual director who shall be appointed by the Roman Catholic bishop of Detroit, who shall have free access to all books and records of the association, and under whose advice all spiritual matters shall be conducted." The by-law concerning the method of selecting members was amended by prefixing as a qualification that they must be "those who are Irish or of Irish parentage, who are Roman Catholics."

The 8th by-law was amended by requiring the committee visiting a very sick member "to exhort the patient to have recourse to the sacraments of the church, and to notify the spiritual director of the member's illness."

The 9th provided for procuring masses for the repose of the souls of deceased members.

The 15th required all purchases of reading matter by the board of directors to be "subject to the approval of the spiritual director."

Another rule forbade the debate in society meetings of defined questions of the Roman Catholic faith, and still another provided for a monthly mass for the society.

The effect of all these regulations is to create an organic connection between the corporation and the church, not only in regard to membership, but in regard to the whole scheme of literary and benevolent purposes included within the objects of the society.

The objection to the present scheme goes beyond the mere form of the by-laws. It lies in the articles themselves, which were drawn upon an erroneous theory of the statutes; and while we think the changes in the by-laws are open to the legal difficulties suggested on the record and upon the argument, their radical defects spring from a want of power under the statutes in question to provide for such matters at all. If such ends are sought to be reached, recourse is necessary to other statutes.

Our constitution is very positive in its requirement

that "no law shall embrace more than one object, which shall be expressed in its title." Art. 4, § 20. The statute of 1865 is confined by its title expressly to "literary and scientific purposes." The 3d section declares that the objects for which corporations are organized under it "shall be only for the promotion of literary and scientific pursuits." The title and this section remain unchanged, and indicate a clear understanding that literary and scientific pursuits are not to be confounded with other matters however proper and desirable.

Our laws have always distinguished between religious purposes and those of general benevolence, as they have between purposes of benevolence and those of a different character. It has been deemed expedient to provide different regulations for all these subjects. No one can hesitate to see that the purpose of the statute of 1867 was to introduce an entirely new object of legislation foreign to the existing statute, and incapable by the most liberal construction of falling within its terms.

This being so, the new law could only have the effect of bringing in an amendment outside of the purpose indicated by the title, and inconsistent with section three, which conforms to the title and which is not amended or repealed. Such an amendment is void as within the express prohibition of the constitution. It does not seek to add to literary and scientific corporations any new incidental powers not inconsistent with their articles. It treats the whole matter added as a new and independent purpose, not requiring any connection with those mentioned in the title, and absolutely repugnant to the 3d section, which would necessarily be repealed as to its 3d subdivision if the amendment could be upheld. The law of 1867 is not a valid statute, and no action depending on it can be upheld. The law of 1865 must continue to be read as if that of 1867 had never been passed.

Looking at the articles of association we see that

their primary purpose is not literary or scientific,· but designed to prevent intemperance by means of union upon a pledge of abstinence from intoxicating drinks, and to provide aid under certain circumstances to the members.    No definite literary purpose is pointed out beyond a library. It would seem from the society rules and by-laws that some further exercises are in use. But the mutual aid provisions are ostensibly the main inducements to membership.    We cannot discover any ground on which any of the purposes not purely literary can be upheld under the constitution of the State, and it is certainly questionable how far an incorporation can be regarded as binding when the principal part of the agreement under which it was framed cannot be upheld.

But assuming that the association may be· regarded as a corporate union of the members for the purpose of maintaining a library and literary exercises, the validity of the new regulations will still come in question, although in a more limited way.

We think that without an amendment of the articles themselves, no restriction except those imposed 'by the 5th article can lawfully be imposed on membership.    A· member once elected cannot be put at a disadvantage on account of his faith in any way whatever.    No by-law can narrow the plain meaning of the articles of association.

Neither, under the statute, can any regulation be lawful which subjects the ·interests of the society to any interference outside of its board of directors.    No. officer can be chosen whose authority does not come directly from the choice of the stockholders or through the ·directors, and no delegation of powers to any committee is authorized by the law except· to such as are members of the board.    Sess. L. 1865, p. 726.    The statute does not contemplate any union for ecclesiastical purposes.    It is unnecessary to consider how far such purposes might be lawfully furthered by such provisions in the articles of association as should confine membership

41 MICH.—10.

to a certain religious faith, and agree upon spiritual supervision. No one under such articles could misunderstand his position, and it would be difficult for any controversy to be created, except by the public.

The present association was probably incorporated under the act in question, not as being precisely applicable, but as coming nearer to the purposes sought than any other statute. But it must always be remembered that no act for creating corporations can ever be extended by construction to cases not reasonably covered by its terms. It can never be assumed that incorporations will be allowed until the attention of the Legislature has been given to each subject meant to be covered. The determination of the powers and conditions of corporate existence is peculiarly a matter of policy and not of law, and requires legislative judgment. There are many lawful purposes for which no corporate powers have been granted, and there is much difference between the terms of such corporation laws as have been enacted.

We are of opinion that each of the several amendments and changes of the by-laws and regulations of the society complained of in the information is a violation of corporate duty under the law, and that all of the powers set forth in the articles beyond those relating to literary, scientific and library purposes, are in law usurpations. Upon the record, as it stands, the corporate character is conceded for some purposes.

While the relator has been legally injured, we see no reason to believe it has been done in bad faith towards him. It would be a harsh proceeding to enter a judgment of ouster from such franchises as are legally possessed, or to impose any substantial fine. The purposes of justice will be fully answered by a judgment of ouster from the illegal franchises, with a nominal fine of one dollar, and the costs of this court.

The other Justices concurred.